[No. 10069. Department One. October 10, 1912.]

## W. L. HALE et al., Respondents, v. JOE BALL et al., Appellants.[1]

BOUNDARIES—LOCATION OF CORNER—EVIDENCE—SUFFICIENCY. The evidence sufficiently shows that a quarter corner was not located on a straight line between the section corners, where a witness testified that he found and identified the original stake out of a true line, which was corroborated by the fact that a line fence was constructed to it by defendant, and the inclosure was farmed for twelve years by others, without objection by defendant, or any effort on his part to correct the alleged mistake, although the land was being bought and sold.

BOUNDARIES—LOST CORNERS—ESTABLISHMENT. An obliterated corner must be restored at its original location if ascertained by competent evidence.

SAME — RIGHT TO COMMISSION — EVIDENCE OF LOCATION — SUFFICIENCY. The court will not appoint a commission to establish a lost corner, under Rem. & Bal. Code, §§ 947-999, merely because the stake was obliterated; and where the corner was not lost or uncertain eighteen years before, at which time a fence was built to it, and nothing had since been done to question the location, the court cannot say that the corner is lost; since evidence of its location was not overcome by better evidence.

Appeal from a judgment of the superior court for Lincoln county, Neal, J., entered May 3, 1911, upon findings in favor of the plaintiffs, after a trial on the merits before the court without a jury, in an action to quiet title. Affirmed.

*Merritt, Oswald & Merritt*, for appellants.

*Martin & Wilson*, for respondents.

CROW, J.—In December, 1892, the defendant Joe Ball, the owner of section 9, township 22, north, range 36, east, Willamette Meridian, dug post holes for a fence across and along the north side of said section. The country there-

[1]Reported in 126 Pac. 942.

about was open and unfenced, and the northeast corner of
section 9 was marked by the original government monu-
ments, and the northwest corner of the section was also
marked by a stone which has been accepted as the true sec-
tion corner. When digging the post holes, he claims that
he found that he was off the true line, and made an angle
to reach the northeast corner of the section. He claims that
he did not find the quarter section corner on the north side
of the section. He explains the fact that he was off a true
line extended from the northeast to the northwest corner of
section 9 by the fact that the day was foggy and he could
not keep the course in view. He set the posts and strung
the wire in the spring of 1893. At that time and for some
time thereafter, section 4, immediately to the north, was
open and unoccupied land. His testimony shows that when
a settler, Charles Cameron, settled on section 4, it was un-
derstood between them, Cameron being a nephew, that the
fence was not on the true line and that, when it needed re-
pair, they would change it. On the other hand, a witness
who had settled in that vicinity in 1880 and on section 8
prior to the coming of Ball, testified as follows:

"Q. Did you ever have an occasion to examine the quarter
section line or quarter section stake half way between the
east and west side of sections 9 and 4, the line that separates
these two sections? A. Yes, sir. . . . Q. Did you ever
have an occasion at about that time or any time prior thereto
to make a close examination of this quarter section corner
I mentioned? A. Yes, sir. Q. Tell the court what you
found there. A. Well, I found the quarter stake. Q. Do
you know whether or not the fence ran through this quarter
section corner? A. I always judged that it did; we knew
that there was a crook there. Q. Did you ever assist in
running these lines? A. I did. Q. What corners in ref-
erence to section 9 did you find? A. We started in on the
west corner of 9 and set a stake at the quarter stake in the
center, and then run from that to the east corner of 10—
between 10, 9 and 4. Q. Then what did you do? A. Well,
we surveyed 9. We went around 9 to see how things were,

just run around it. A man hired a fellow to survey it; was going to buy it before Ball got it. Q. At that time, did you find the 4 corners of section 9? A. Yes, sir. Q. Did you find the government corners, the 4 corners of section 9? A. Yes, sir. Q. I will ask you if you found half way stake or the north quarter corner of section 9 at that time? A. On that crooked line? Q. Yes. A. Yes, sir, we found the stake there and put up flag. Q. Where was that stake with reference to being midway between the east and west corners? A. I don't remember. I don't know whether it was quite in the center or not. We always thought it was in the center. All quarter stakes were thought to be in the center. Q. Was the line straight on the north side of section 9? A. I don't think any of the lines were very straight . . . . . Q. You say that you commenced to survey at the northwest corner of section 9? A. Yes, sir. Q. What did you find there? A. We found what we called a corner stake. Q. Anything else? A. When we got to the other one, there were two pits and a corner stake; all we had to go by— Q. Mr. Grant, just answer each question as I come to it. What did you find at the northwest corner of section? . . . A. A stake. Q. What mark on it? A. Well, I could tell at that time, but I do not remember much about it now. Q. What else did you see there besides this stake? A. 4 pits. Q. Did this stake have any letters or figures on it? A. Yes, sir. Q. Similar to other stakes? A. Exactly the same as other stakes. Q. Four pits and this stake? A. Yes, sir. Q. Just tell the course you took. A. We went and hunted up the quarter corner stake. Q. What was the next stake that you found? A. The quarter, half mile stake. Q. Where was that? A. Supposed to be a half mile from the other corner. I didn't measure that. Q. What did you do immediately after you left the northwest corner? A. Well, we went right to the middle of the section and found the quarter stake. Q. You went to the middle of the section; did you run right on to the quarter corner? A. No, sir; we had to hunt a good deal. Q. You set flag first, did you? A. Yes, sir. Q. Then you ran a half mile due east, did you? A. Yes, sir. Q. At that place did you find this quarter corner? A. Yes, sir. Q. How is that? A. Yes, sir. Q. Did you have any trouble in finding that quarter corner? A. Yes, lots of trouble. Q. Tell the court what you had to do. A. We found the corners before

the surveyor came there— Mr. Merritt: Just answer the questions so I won't have to object. A. We hunted for it. After we found the quarter stake, then we went to the next corner. Q. The surveyor started from the northwest corner and found another corner, didn't he? A. No, sir; we had corners found before the surveyor got there. Q. Where did the surveyor stop when he went a half mile from the northwest corner? A. At the quarter stake. Q. Came right up to the quarter stake? A. We put a flag there. We were only running on the line. Q. As I understand you, you had these corners figured out before the surveyor got there. A. Yes, sir. We had a timber culture in section 10 and had to find the corners to get our ditch fence on the line, on the northwest corner of 10 . . . . . Q. I will ask you if you had any trouble in locating that quarter corner? A. Yes, sir. Q. What trouble did you have? A. I don't understand. We just had to hunt for it until we got it. Q. Was it out of line between the northwest and northeast corners of section 9? A. It was in on 9. Q. How much? A. Quite a ways. I don't remember now. Q. And you found it in '82? A. Yes, sir; at the time we located our timber claim. Q. Could you tell the court about how many steps it was out of a straight line between the northeast and northwest corners of section 9? A. No, sir. Q. Quite a ways? A. Yes, sir. Q. And you had a great deal of trouble locating it? A. Yes, sir. Q. What did you find there when you found it? Just tell the court what you found. How did the ground look? A. Well, there was a stake and two pits. Q. What kind of a looking stake was it? A. Just like any other corner stake. Q. Any figures and letters on it? A. Yes, sir; I think it had 'one quarter' marked on it."

He also testified that he had a timber culture on section 10, and had dug a ditch fence beginning at the northeast quarter of section 9 and thence running east; that he took his course from the quarter section corner on the north line of section 9, and sighted across the northeast corner; that he afterwards had his land surveyed and found that his fence bore to the north. The testimony further shows that it was possible, at the time defendant Ball dug his post holes and built his fence, to mark a true line between the north corners

of section 9 by flagging, or by going on a high hill on section 10 from which both corners could be seen. The owner of section 4 farmed the land in dispute up to 1906, when he sold it, since which time it has passed through several ownerships. Defendant never made any demand for the crops and, so far as the subsequent owners are concerned, no claim to the title of the land, although there is some evidence that the crook or jog in the fence was an eyesore to him, and that he made some effort to have it straightened by voluntary agreement of the parties. At one time he offered to buy the land lying south of a true line between the north corners'of section 9, but refused to consider the price asked. This he explains by saying that he was not then informed of his legal rights, and supposed that the lapse of time had confirmed title in the owners of section 4. No claim of ownership to the extent of threatening to take possession of the land or of the crops raised thereon was ever made, until August, 1910; whereupon this suit was brought to quiet title to the strip he alleges to be taken off of the north line of section 9. Defendants answered the complaint, making general denials, and alleging that the true boundary was lost, and prayed for a commission to issue to three competent men to establish the true boundary between sections 4 and 9. From a decree in favor of plaintiffs, an appeal is taken.

While presumptively quarter section corners are set upon a true line and at a point equidistant between section corners, it is well known that it is not always so. In fact, the carelessness and inattention marking the original government surveys in this part of the country have led the courts to say of their own judicial knowledge that a survey is seldom correct. *Koenig v. Whatcom Falls Mill Co.*, 67 Wash. 632, 122 Pac. 16; *Hyde v. Phillips*, 61 Wash. 314, 112 Pac. 257. When it is made to appear by competent evidence that a government monument does not accord with the survey or plat, the corner as established on the ground must control. It is contended that, inasmuch as the parties claimed no more than

the lands embraced within the limits of sections 4 and 9 respectively, the case of *Bowers v. Ledgerwood*, 25 Wash. 14, 64 Pac. 936, and like cases control. But these cases do not meet the facts here presented. In this case the enclosure was made by the appellant, and although we accept a straight line between the section corners as the true line, appellant left out of his inclosure a strip of land which has been farmed by others for twelve years or more, and no witness other than his relatives (he claims that the line was not straightened under a family agreement) have testified to any claim of ownership on his part. With the country open and it requiring, according to the testimony, no more than two days to reset the fence, appellant not only did not do so, but never attempted to carry out his agreement with his nephew to reset the fence. He knew the land was being bought and sold, yet did nothing to challenge the rights of the several owners to the land and the crops raised thereon. We agree with the trial judge that these facts do not work an estoppel, for there can be no estoppel under the pleadings. But they do lend faith and color, and tend to support the witness who swears that he found a quarter section corner on the north line of section 9, and that it was quite a ways south of the true line as he had supposed it to be. All these circumstances, when coupled with his positive declarations (and he is in no way impeached or disputed), make a preponderance of the evidence in favor of respondents.

While we have so far considered these facts as evidentiary and not as matters of estoppel, they also operate to deny appellants the relief asked in the way of a commission; for a preponderance of the evidence shows that, at about the time appellant built his fence, the quarter corner was in existence. It was not lost nor was it then uncertain. If it has become lost or uncertain during the eighteen or twenty years since he built his fence, he should not be heard to assert that fact as against present owners, for he would

thus, by his own negligence and delay, reap a reward which equity gives only to the vigilant. We conceive that there is a distinction between a lost corner and a corner the markings of which have been obliterated. If no monument or marking of a quarter corner can be found, or the testimony of its location be overcome by better evidence, a court will decree the establishment of a corner under the rule prevailing in the land department of the United States; that is, at a point equidistant from the section corners. *King v. Carmichael,* 45 Wash. 127, 87 Pac. 1120; *Koenig v. Whatcom Falls Mill Co., supra.* But it does not follow that, if there be evidence of a corner which has been destroyed or obliterated by the lapse of time, a court will direct the establishment of a corner under the rule stated, or any other rule, for the law establishes an obliterated corner where the surveyor actually located it, and not where it ought to be located by a correct survey. *Inmon v. Pearson,* 47 Wash. 402, 92 Pac. 279.

The evidence is all before us and nothing would be gained by appointing a commission. The question is a judicial one, and it is only where the court can say from the evidence adduced that the corner is lost or uncertain, that the statute, Rem. & Bal. Code, §§ 947-999, is available to one who is disputing a boundary. We are satisfied that, although the line is irregular, respondents have sustained their cause of action by a preponderance of the evidence, and that they are entitled to an affirmance of the decree.

Affirmed.

Morris, Parker, Chadwick, and Gose, JJ., concur.